**CONFIDENTIAL / SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MICHAEL GRASSI and CFOM, INC., ) | |
| ) | |
| Plaintiffs-Counterclaim Defendants, ) | Case No.   1:18-cv-2619 |
| ) | |
| v.                                                       ) | JUDGE PAMELA BARKER |
| ) | |
| ) | |
| JOHN GRASSI and ALOTECH LIMITED, ) | |
| LLC,                                                   ) | |
| ) | |
| Defendants-Counterclaimants.       ) | |
| ) | |

**DEFENDANT COUNTERCLAIMANTS' TRIAL BRIEF**

COME NOW Defendants-Counterclaimants John Grassi and Alotech Limited, LLC ("Alotech") (collectively, "Defendants"), by and through counsel and pursuant to the Court's *Civil Trial Order* (Doc. #92), and submit the following trial brief in advance of the pending May 31, 2022, trial of this matter.

A.     **STATEMENT OF THE FACTS**

This case arises out of a dispute between two brothers, John Grassi and Michael Grassi. John Grassi co-founded Alotech in 1998 with his business partner Dr. John Campbell (whose interest he later bought out). Since 2009, John Grassi has been the President REDACTED ▮▮▮.

Alotech developed and perfected a proprietary process for manufacturing aluminum castings known as ablation casting. Since 2002, Alotech has designed and installed ablation casting units at a number of facilities, and its ablation casting process has been used to produce

1

prototype and production-grade parts for a number of companies in the REDACTED industries. Alotech has obtained approximately six separate patents in the field of ablation casting.  Alotech has carefully and consistently documented its relationships with its vendors, collaborators, customers, and site visitors to ablation facilities.  The documentation is important not only for confirming each party's understanding of their relationship, but also to assure proper protection of Alotech's trade secrets and confidential information, which Alotech takes steps to closely guard.

Beginning in approximately 2006, Alotech engaged CFOM, Inc. ("CFOM"), as a supplier of valves and other equipment used in ablation casting. CFOM is owned by Michael Grassi, John's brother. Michael was working on multiple ideas and eventually secured patents for a cooktop, a bicycle power meter, a bicycle derailleur system, and a stun grenade.  Plaintiffs had little to no success in commercializing any of these inventions.  None of these inventions involve ablation casting technology.  Between the two brothers, John Grassi had significantly greater business and invention success, achieving renown in the field of metallurgy and casting for his work with Dr. Campbell in inventing and bringing forward the revolutionary ablation casting technology. Michael was in John's shadow on every front, despite their mother's yearning for her twin sons to be equally successful.

In 2006, Michael Grassi asked his brother to help him with new business due to CFOM's decline in business.  In response, Alotech engaged CFOM as a vendor to supply equipment and provide services.  REDACTED to CFOM for its work between 2006 and 2017. In 2012, Alotech also hired Michael Grassi as a W-2 employee of Alotech; he worked for the company until his termination in 2017, and REDACTED .  John first engaged Michael and CFOM as a way to secure the services of

2

Michael's best friend, Charles Rizzuti, who provided assistance (though CFOM) writing source code and providing programming for equipment used in the ablation process.[1]  John also saw his engagement with CFOM as an opportunity for Michael to grow his business in a new and more profitable way.  John and Michael's mother was happy when she learned that Michael was working for John.  John Grassi made no effort to explain the details of his business arrangements to his mother, namely that Michael was doing limited contracted work for John on a process that John invented and owned.  Rather, he was happy for her to understand the relationship simply as John and Mike working together.

Before being engaged as a contractor for Alotech, Michael Grassi and CFOM were not active in any way in the process of inventing and commercializing Alotech's ablation process.  Indeed, between 2002 and approximately 2006, Alotech successfully deployed ablation units in various locations and provided prototype and production ready castings for a number of REDACTED without reliance on the services of CFOM or Michael Grassi.  REDACTED .

After engaging CFOM as a vendor, and then Michael as an employee, Alotech provided CFOM and Michael access to Alotech's confidential information and trade secret ablation technology on a need to know basis, in order to fulfill their purchase order requirements or their assigned work on behalf of Alotech.  Alotech required CFOM to sign a non-disclosure agreement in 2006 when CFOM was being considered as a source of vendor services to Alotech.  Alotech

---

[1]  Charles Rizzuti is no longer a party to this lawsuit.  As a matter of settled law, Rizzuti does not have any claim to either additional monetary payments from Alotech or any ownership stake in Alotech.  See ECF 36 (Summary Judgment Order, p. 31.)  However, Mr. Rizzuti is still an interested party with respect to the outcome of this proceeding, as he has testified that Michael Grassi promised him 40% of the money paid to CFOM by Alotech for work on ablation.

later required CFOM and many others to sign an IP agreement in October 2012, when Honda was conducting due diligence to ensure Alotech's ownership of all rights to the ablation process Honda was preparing to license.  Michael signed the Contractor IP agreement on behalf of CFOM twice, once on October 22, 2012 with a Pennsylvania address he used for CFOM at that time.  He signed the same document again on October 25, 2012 with an updated address to reflect his then current home address in Minnesota.  The language of the two October 2012 agreements is identical, and hereafter will be referenced as the "2012 Work Product and Confidentiality Agreements."

The current dispute centers on Michael Grassi's contention that John Grassi orally promised in September 2012 to give Michael Grassi and CFOM 35% of the "proceeds" of a pending licensing contract between Alotech and Honda that had not yet been signed at the time.  This alleged oral agreement is the basis for Plaintiff's breach of contract and promissory estoppel claims.  Plaintiffs allege that this oral agreement concerning Honda occurred in September 2012, around the same time Michael Grassi was hired as an employee of Alotech.  John Grassi had discovered just a month earlier that its CFO, John Black, had embezzled over $1.2 million from Alotech, throwing Alotech's financial health into turmoil.

Defendants dispute that the alleged oral agreement was ever made between John Grassi and Michael Grassi.  Plaintiffs fail to explain why John Grassi would offer Michael Grassi 35% of either the proceeds or the profits from an exclusive licensing agreement with a major automotive company that had not even been finalized at that time, especially when Alotech was in a difficult financial situation.  Michael Grassi and CFOM had only narrow involvement with the ablation casting process, as one of many vendors before September 2012, and had no involvement in the invention or commercialization of the process prior to being engaged as a vendor.  Even as a vendor, Plaintiffs had limited involvement with Alotech and its co-inventors and collaborators.

4

As noted, Alotech was installing ablation units and producing castings and parts at a variety of sites, including working in Europe, with no assistance of Plaintiffs before 2006, and with only narrow assistance from Plaintiffs before Michael became an employee of Alotech in 2012.  By the time Michael became an employee of Alotech, all of the intellectual property necessary to the Honda license was settled.  REDACTED

At the time Michael Grassi was hired by Alotech, in September or October 2012, the Honda license was not yet finalized because extensive due diligence conducted by Honda was ongoing. Both material engineering due diligence and IP due diligence had taken place over the length of Alotech's engagement with Honda, but was exhaustive towards the later part of 2012 and early 2013.  Honda had to ensure that Alotech had unencumbered rights to the technology and process that Honda was licensing.  Alotech did agree to help Honda understand the process and what they would need to have in place in their facility to run the process when the license went into effect. This involved significant work on the part of all Alotech employees, working with Honda, from September 2012 to April 2013.  The Alotech employees, including Mike Grassi by that time, worked to help Honda understand and implement Alotech ablation technology that was already settled and successfully prototyped for Honda prior to September 2012.

Not only was there no positive business or technical reason for Alotech to ever offer Michael Grassi and CFOM 35% of its proceeds from the Honda license, Defendants submit that it defies credulity that John Grassi would have offered Michael Grassi or CFOM 35% of Alotech's expected income in the wake of the John Black theft (and at the same time Alotech had agreed to hire Michael Grassi as a W-2 employee with a six-figure salary).  Moreover, no reasonable business owner would commit to paying a share of "proceeds" from a transaction, irrespective of

the costs and overhead incurred to perform the transaction. Given Plaintiffs' conflicting and vague testimony as to what the specific terms of the alleged agreement were, Defendants dispute that there was a meeting of the minds about any alleged "agreement."

Perhaps most importantly, before Michael parted ways with Alotech in 2017, there is no writing or communication of any kind that specifically references an agreement for Plaintiffs to receive 35% of the Honda license proceeds.  REDACTED

, there is no email from Michael Grassi asking why he wasn't getting paid his 35%, or asking how his 35% was being recognized in Alotech's books if it wasn't being paid out when the payment arrived from Honda each year.  There is evidence that Michael was sometimes unhappy with his lot at Alotech, and thought he deserved more or different terms than would be given to a standard employee and standard contractor.  However, there is no evidence anywhere that he understood himself or CFOM to be entitled to 35% of the Honda license proceeds.  There is certainly no evidence that Alotech understood Michael or CFOM to be entitled to 35% of the Honda license proceeds.

This is because the alleged oral agreement never happened.  Michael Grassi made it up after his relationship with John and Alotech fractured in 2017.  The best evidence of the specific terms of the arrangement between Defendants and Plaintiffs concerning Plaintiffs' work on Alotech's ablation process is captured in the clear language of the 2012 Work Product and Confidentiality Agreements.  Alotech relied on the terms outlined in those agreements as it interacted with CFOM and Michael Grassi. The 2012 Work Product and Confidentiality Agreements confirm that Alotech is the owner of all ablation technology involved in work done for Alotech by CFOM.  Those agreements make no mention of Michael's concocted oral agreement for 35% of the proceed from the Honda license.  Because those signed agreements stand

in the way of the story Plaintiffs have invented to try to misappropriate both money and intellectual renown from Defendants, Michael Grassi now contends that they are forged documents. He claims that he did not sign them. Defendants will introduce voluminous evidence confirming what common sense would indicate – Michael Grassi did sign those documents. His self-serving and unsupported claims of forgery are lies – lies that have cost defendants, the court system, and many other individuals a significant amount of expense, delay, lost opportunities, and emotional pain.

Beyond business and family dynamics, this dispute centers around the invention, use, and ownership of ablation casting technology. John Grassi conducted the first ablation test in his driveway, using tools and a process that he invented and built in collaboration with his co-inventor Dr. John Campbell. By 2003, Alotech was negotiating with various companies who had seen Alotech's process and understood how it could transform their options for lightweight, intricate, and extremely strong aluminum parts (magnesium or nonferrous). The products can range from small connecting pieces, knuckles, or nodes, to wheel frames, to body frame parts of vehicles and motorcycles. The possibilities for improvement in aluminum products is nearly endless when a manufacturer is able to take advantage of ablation to create some of its product parts. Significant players in the field of aluminum and automotive manufacturing were hearing about Alotech's process, and learning of John Grassi and Dr. John Campbell's revolutionary invention, in 2003 and 2004. Alotech had offers to license the process REDACTED period. Some business opportunities did not come to fruition for various reasons, and others did. But the Alotech ablation process, and its related patents, were already highly developed and successful as early as 2003.

Plaintiffs did not independently invent any part of the ablation process. Plaintiffs only became involved to any degree beginning in 2006. And from that time on, all of the work they

performed for Alotech, whether as contractor or employee, was based on trade secret information and instruction from Alotech.  To the extent that any work of Plaintiffs resulted in improvements to the process, which is questionable, those improvements were assigned to Alotech, who paid them for the work.

During his time as an employee of Alotech, Michael was involved in ablation, leading to his name being added to the patent utility application filed in 2017.  The 2017 patent names John Grassi, Dr. John Campbell, and Michael Grassi as inventors. Consistent with the agreements in place between the parties, all three inventors signed documents assigning their inventor rights in the patent to Alotech.  In fact, Michael signed the assignment twice, once on April 20, 2017, and again on June 14, 2017.  His signature on the June 14, 2017 assignment was notarized by Vicki Hawker (the "June 2017 Patent Assignment") and was filed with the United States Patent and Trademark Office.

Plaintiffs claim that Defendants "misappropriated" their "trade secrets" within the meaning of Ohio Revised Code § 1333.61.[2]  Defendants dispute Plaintiffs' claim. First, any trade secrets used by Alotech for ablation casting technology were invented by Alotech and its collaborators. Alotech owns many patents confirming its invention of the ablation process, and confirming that these purported trade secrets have been publicly disclosed without contemporaneous complaint by Michael Grassi and therefore cannot qualify as trade secrets at all.  Many of those patents were

---

[2] Plaintiffs claim to have trade secret ownership regarding valve equipment used in ablation, software programming related to those valves, fast cure, and reclamation.  Valves manage the speed and projection of water sprayed onto the sand mold to cause the mold to ablate, or dissolve away from the molten aluminum.  Fast cure is the process for creating an aggregate mold that solidifies for use in ablation in a short time period.  The speed of cure on aggregate molds used in ablation is primarily a function of the binder product used in creating the aggregate mold.  Alotech uses a binder invented and engineered by Dr. Campbell and John Grassi that is a trade secret of Alotech.  It is supplied exclusively by a vendor named DeVenne pursuant to a contract between Alotech and DeVenne and may or may not include DeVenne trade secret ingredients.   Reclamation is the process by which aggregate and material washed off in the ablation process is cleaned and re-used to make new molds.

issued between 2000 and 2007.  Michael Grassi knew that Alotech owned these patents and that he was not an inventor on any of them before the 2017 utility patent.  Michael Grassi never challenged those patents or the identified inventors before filing this lawsuit.  Second, the 2012 Work Product and Confidentiality Agreements, as well as the June 2017 Patent Assignment, make clear that Alotech had ownership of any and all intellectual property that Michael Grassi conveyed to the Defendants.

Conveniently, Plaintiffs counter that the October 2012 Work Product and Confidentiality Agreements and the June 2017 Patent Assignment were forged. The evidence at trial will show otherwise.  Importantly, the evidence is replete with examples of Michael Grassi's knowledge of and agreement with Alotech's use of all aspects of the ablation process and Alotech's assertion of ownership of all aspects.  Michael Grassi admits that he 1) knew of all of the patents and trade secrets identified in the license agreement with Honda, 2) knew that they were all being identified as Alotech's intellectual property, and 3) made no objection to that aspect of the Honda license agreement.  Further, Michael Grassi took no efforts, let alone the efforts required, to keep any of this information confidential as is required to establish a protected trade secret.  Finally, Michael Grassi and CFOM were paid handsomely for any ablation work they did, REDACTED .  Plaintiffs can show neither misappropriation nor damages.

Defendants have filed a declaratory judgment seeking a declaration that the Plaintiffs have no legally cognizable ownership rights in the ablation casting technology that Alotech is using in its business and selling to third parties. Multiple reasons support that the declaration Alotech seeks is true and accurate and should be granted.  Most directly, the 2012 Work Product and Confidentiality Agreements and the June 2017 Patent Assignment show that Plaintiffs have no rights to the ablation casting technology Alotech invented and licenses to third parties.   Plaintiffs

have also produced no evidence of independently inventing, protecting, patenting, or licensing any aspect of the ablation casting technology that Alotech uses in its business and licenses to third parties.  Michael Grassi has damaged Alotech's business prospects by falsely claiming rights to Alotech's technology.   Prevailing on its declaratory judgment claim will allow Alotech to defend itself and its proprietary process from Michael Grassi's unfounded and harmful interference with Alotech's business.  At trial, Defendants intend to vigorously prosecute their declaratory judgment claim and defend against Plaintiffs' three pending claims.

**B.**    **CONTROLLING LAW**

"A federal court sitting in a diversity case must apply the directed verdict standard of the state whose substantive law governs the action." *Rhea v. Massey-Ferguson, Inc.*, 767 F.2d 266, 269 (6th Cir. 1985). In Ohio, the civil rule governing the standard for granting a directed verdict motion is as follows:

> When a motion for a directed verdict has been properly made, and a trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion about the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

Ohio R. Civ. P. 50(A)(4).

"In determining whether reasonable minds can reach but one conclusion, the court cannot 'consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion.'" *Briney v. Sears, Roebuck & Co.*, 782 F.2d 585, 587 (6th Cir. 1986) (quoting *Strother v. Hutchinson*, 67 Ohio St.2d 282, 284, 423 N.E.2d 467 (Ohio 1981) (per curiam)). "In order to avoid an adverse directed verdict ruling, a plaintiff must have produced evidence which supports 'every essential element to establish liability, or produce evidence of a fact upon which a

reasonable inference may be predicated to support such element.'" *Briney*, 782 F.2d at 587 (quoting *Strother*, 67 Ohio St.2d at 285).

### **Plaintiffs' Claim for Breach of Contract**

Plaintiffs allege that in September 2012 John Grassi orally agreed to pay Michael Grassi 35% of the proceeds from an agreement that was then under negotiation between Defendants and Honda, and that Defendants failed to honor the September 2012 agreement, causing the Plaintiffs' loss. Plaintiffs allege that "proceeds" in this context means gross revenue, *i.e.*, without regard for any investments made or costs incurred by Alotech in securing and performing the Honda agreement.

A party seeking to prove the existence of a binding oral contract must demonstrate by clear and convincing evidence[3] the same elements as a written contract, namely: (i) offer and acceptance; (ii) contractual capacity of the parties; (iii) consideration; (iv) mutual assent, *e.g.*, a "meeting of the minds" on the essential terms; and (v) legality. *See Ironhead Marine, Inc. v. Donald C. Hannah Corp.*, No. 3:10-cv-82, 2015 WL 669004, at *3 (N.D. Ohio Feb. 17, 2015) (citing *Donofrio v. Whitman*, 947 N.E.2d 715, 721 (Ohio Ct. App. 7th Dist. 2010)); *Rorick v. Silverman*, No. 1:14-CV-312, 2017 WL 3124155, at *10 (S.D. Ohio July 24, 2017), *report and recommendation adopted*, No. 1:14-CV-312, 2018 WL 1532600 (S.D. Ohio Mar. 29, 2018).  A contract must be "definite as to its essential terms." *MMK Grp., LLC v. SheShells Co., LLC*, 591 F. Supp. 2d 944, 963 (N.D. Ohio 2008).

Absent proof of mutual assent, a plaintiff cannot establish the existence of a contract.  *Rentz v. Dynasty Apparel Indus., Inc.*, No. C-3-96-205, 1999 WL 35801176, at *4 (S.D. Ohio Feb. 5, 1999) ("Black letter Ohio contract law imposes a requirement of mutual assent in order for an

---

[3] For a discussion on the applicable burden of proof for this claim, *see* Part G. *infra*.

express or implied contract to exist."). Mutual assent is determined by the standard of a reasonable person based on the objective manifestations of the parties. Mutual assent arises out of the intent of the parties as shown by the reasonable meaning of their words and conduct, and not from any unexpressed intention or understanding of either party. In deciding whether there was mutual assent, the fact finder should consider not only the words and conduct of the parties, but also the circumstances under which the words were used and the conduct occurred. *See Ford v. Tandy Transportation, Inc.*, 86 Ohio App.3d 364, 380 (Ohio Ct. App. 4th Dist. 1993). *Kostelnik v. Helper*, 96 Ohio St.3d 1, 770 N.E.2d 58, 62 (Ohio 2002). An essential element needed to form a contract is that the parties must have distinct and common intention which is communicated by each party to the other. *See id*. If the parties have no meeting of the minds there is no contract. *See id*.  In Ohio, "[s]ecretly held, unexpressed intent is not relevant to whether a contract is formed." *Byler v. Air Methods, Corp*., 823 F. App'x 356, 364 (6th Cir. 2020) (citation and internal quotation marks omitted).

### Plaintiffs' Claim for Promissory Estoppel

Plaintiffs' claim for promissory estoppel is based upon the same oral promise that Plaintiffs allege in their breach of contract claim—namely, that John Grassi orally agreed to pay Michael Grassi 35% of the proceeds from an agreement that was then under negotiation between Defendants and Honda. Plaintiffs claim that Defendants are precluded from denying the existence of the alleged oral agreement based upon the doctrine of promissory estoppel.

To establish a promissory estoppel claim "[t]here must be a promise, clear and unambiguous in its terms, reliance by the party to whom the promise is made, the reliance must be reasonable and foreseeable, and the party claiming estoppel must be injured by the reliance." *Cohen & Co., CPAs v. Messina, CPA*, 492 N.E.2d 867, 872 (Ohio Ct. App. 8th Dist. 1985). The

party asserting "the promissory-estoppel claim bears the burden of proving by clear and convincing evidence[4] all the elements of the claim." *Cranpark, Inc. v. Rogers Group, Inc.*, 498 F. App'x 563, 571 (6th Cir. 2012) (quoting *HAD Enters. v. Galloway*, 192 Ohio App.3d 133, 948 N.E.2d 473, 481 (Ohio Ct. App. 4th Dist. 2011)).

"Promissory estoppel does not apply if an unambiguous written contract governs." *Whitacre v. Nations Lending Corporation*, No. 5:19-CV-809, 2019 WL 3477262, at *6 (N.D. Ohio July 31, 2019) (citing *Pacifica Loan Five, LLC v. Fifth Third Bank*, No. 1:09-CV-930, 2011 WL 13228111, at *5 (S.D. Ohio Apr. 14, 2011)).

### Plaintiffs' Claim for Misappropriation of Trade Secrets

The Plaintiffs' trade secrets misappropriation claim is based on the Plaintiffs' allegations that the Defendants utilized Plaintiffs' ablation casting technology without Plaintiffs' consent. To prevail on a misappropriation of trade secrets claim, a plaintiff must show by a preponderance of the evidence that: (1) they own a trade secret; (2) the defendants acquired the trade secret because of a confidential relationship; and (3) the defendants used the trade secret without authorization. *Handel's Enterprises, Inc. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019); *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003)); *Coda Developments s.r.o. v. Goodyear Tire & Rubber Co.*, 5:15-cv-1572, 2021 WL 4477913, at *8 (N.D. Ohio Sept. 30, 2021); *Advance Wire Forming, Inc. v. Stein*, No. 1:18-cv-723, 2020 WL 5026523, at *19 (N.D. Ohio Aug. 25, 2020); *Maatuk v. Emerson Electric*, 1:16-CV-03023, 2017 WL 9485679, at *5 (N.D. Ohio Nov. 14, 2017). If Alotech was a co-inventor of any trade secret identified by Plaintiffs, that trade secret cannot form the basis of a misappropriation claim because Alotech would have its own rights to use of the trade secret. *See* Ohio Rev. Code § 1333.61(B)(1)-(2) (defining "misappropriation" as

---

[4] For a discussion on the applicable burden of proof for this claim, *see* Part G. *infra*.

either the "[a]cquisition of a trade secret *of another*" or the "[d]isclosure or use of a trade secret *of another*. . . .") (emphasis added). Plaintiffs must show that they independently invented a specific trade secret as a first step to prevailing on a claim for misappropriation of trade secrets.

Ohio law defines a "trade secret" as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).

For additional guidance, the Supreme Court of Ohio interpreted the statute and adopted six factors to identify a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997) (citing *Pyromatics, Inc. v. Petruziello*, 454 N.E.2d 588, 592 (Ohio Ct. App. 8th Dist. 1983)). Although no one factor is dispositive, the most important factor is whether the owner of a potential trade secret has taken active steps to maintain its secrecy. *Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 862 (6th Cir. 2008) (internal citations omitted). Those active

steps must be "reasonable" under the circumstances. *Id. See, e.g.*, *Hoffman-La Roche Inc. v. Yoder*, 950 F.Supp.1348, 1360-65 (S.D. Ohio 1997) (denying claim for injunctive relief brought under Ohio's Uniform Trade Secrets Act when plaintiff did not take reasonable steps to maintain secrecy of information).

A "misappropriation" is defined as follows:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B).

Lastly, to the extent Michael Grassi claims trade secret misappropriation occurring and discovered before October 2014, those claims are barred by the four-year statute of limitations applicable to the Ohio Trade Secrets Act.  Ohio Rev. Code § 1333.66; *Stolle Machinery Co., LLC v. RAMS Precision Instruments*, 605 F. App'x 473, 482 (6th Cir. 2015) ("Under the OUTSA statute of limitations, a plaintiff must bring suit "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.").

**Defendants' Counterclaim for Declaratory Judgment**

The Defendants seek a declaratory judgment in Counterclaim III declaring that the Plaintiffs have no legally cognizable ownership rights in the ablation casting intellectual property that

15

Alotech uses and licenses to third parties. Defendants' request for a declaration that Plaintiffs have no legally cognizable ownership rights in the ablation casting that Alotech is using in its business and selling to third parties is a narrowed version of Defendants' original claim. *See Memorandum of Opinion and Order* (Doc. #36), at 23.[5]

The Declaratory Judgment Act requires proof of an actual or threatened injury to establish the existence of an "actual controversy." 28 U.S.C. § 2201(a). To satisfy § 2201(a)'s actual controversy requirement, the parties' conflicting contentions must present a dispute that is substantial and concrete and not merely hypothetical or abstract. *See Kardules v. City of Columbus,* 95 F.3d 1335, 1343-44 (6th Cir. 1996); *Mich. State Chamber of Commerce v. Austin,* 788 F.2d 1178, 1184 (6th Cir. 1986). Where both parties claim ownership of the same intellectual property, the presence of conflicting legal interests is unquestionable, such as when there is a question of interpretation or enforceability of a contract regarding the ownership of the intellectual property rights in issue. *See QQC, Inc. v. Hewlett-Packard Co*, 258 F. Supp. 2d 718, 724-25 (E.D. Mich. 2003) ("Both Plaintiffs and Defendant claim ownership of the same intellectual property; thus, the presence of conflicting legal interests is unquestionable."); *see also Panhandle E. Pipe Line Co. v. Mich. Consol. Gas Co.,* 177 F.2d 942, 944 (6th Cir. 1949) ("where there is controversy as to the meaning and effect of a written contract[,] interpretation may be sought from and made by the declaratory judgment").

"A district court has the discretion to determine whether to entertain an action requesting declaratory judgment." *Skurka Aerospace, Inc. v. Eaton Aerospace, LLC*, No. 1:08-CV-1565, 2013 WL 12130432, at *4 (N.D. Ohio Mar. 22, 2014) (citing *AmSouth Bank v. Dale*, 386 F.3d 763, 784

---

[5] The Court previously noted in its summary judgment opinion that the declaration requested in Defendants' Counterclaim III was "too broad" and could be narrowed to a declaration that the Plaintiffs do not have any legally cognizable ownership rights in the intellectual property in ablation casting technology that Alotech is using in its business and selling to third parties. *Id.*

(6th Cir. 2004)). Once the court determines that there is an actual controversy, the district court is to use the following five-factor test to determine whether the court should exercise jurisdiction over a declaratory judgment claim. *Skurka Aerospace*, 2013 WL 12130432, at *4. The court must consider:

> (1) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citations omitted).

**C.     DEFENDANTS' LIST OF PROPOSED WITNESSES**

Attached hereto as <u>Exhibit A</u> is a list of the witnesses that Defendants presently intend to call at trial, along with a summary of their expected testimony.

**D.     EXHIBIT LIST**

Attached hereto as <u>Exhibit B</u> is an indexed list of the exhibits that Defendants may use during the trial of this matter. Defendants reserve the right to supplement this list as may be necessary prior to, or in the course of, the trial of this matter, where good cause requires such supplementation.

**E.     EVIDENTIARY ISSUES LIKELY TO ARISE AT TRIAL**

Defendants currently have submitted six (6) separate motions in limine, identifying the evidence and testimony that they believe should be admitted or excluded from admission at trial. Those motions are pending, and many of them have significant implications on the trial of this matter.  Plaintiffs have submitted seven (7) motions in limine.  These identify the evidentiary issues most likely to arise at trial.  Defendants incorporate herein, by reference, the facts, law and argument contained in their motions in limine briefing.

17

<u>PROPOSED *VOIR DIRE* QUESTIONS</u>

  Defendants submit the following proposed *voir dire* questions:

1.  Do you have any special training or experience in science or engineering? (Y/N)

2.  If so, please explain.

3.  Have you ever worked for a foundry, or any company involved in metal casting? (Y/N)

4.  If so, please explain.

5.  Are you satisfied with your current employment situation? (Y/N)

6.  Do you negotiate deals or contracts at your job? (Y/N)

7.  Have you, a family member, or close friend ever invented or designed anything? (Y/N)

8.  If so, please explain.

9.  Have you, a family member, or close friend ever applied for, been granted, or owned any patents? (Y/N)

10. If so, please explain.

**F.**    <u>**PROPOSED JURY INSTRUCTIONS**</u>

Attached hereto as <u>Exhibit C</u> is a copy of the proposed jury instructions.  The parties have been unable to meet and confer yet on an agreed set of instructions, but have made plans to do so and will provide the Court with a set showing areas of agreement and disagreement, as required in this Court's Civil Trial Order (ECF No. 92), as soon as possible.

Additionally, Defendants request that the jury receive the following stipulations from the court:

- Charles Rizzuti does not have any claim to either additional monetary payments from Alotech or any ownership stake in Alotech.

18

- REDACTED
  .

- There is no written agreement pursuant to which John Grassi and Michael Grassi mutually agreed to split the proceeds that Alotech received from the Honda agreement on a 65/35 basis.

Defendants anticipate a dispute over the burden of proof applicable to Plaintiffs' claim for breach of contract and promissory estoppel. For purposes of this Trial Brief, Defendants will address the legal issues relating to the burden of proof.

**Plaintiffs' Breach of Contract Claim**

Plaintiffs may assert that their claim for breach of the alleged oral contract is subject to a preponderance of the evidence burden. Defendants, however, assert that such claim is subject to a clear and convincing burden.

The Court previously applied the clear and convincing burden to Plaintiffs' breach of contract claim in its Summary Judgment Opinion and Order. (*See* Doc. #36 at 12) ("Ohio courts have held that the burden of proof on one seeking to enforce an oral contract requires that party to prove the existence of the contract by clear and convincing evidence.") (citation and internal quotation marks omitted). However, at trial the Court held that it would apply the preponderance burden. Sealed Trial Tr. v.4, Doc. #69 at 783:18-25, 784:1-25 & 785:1-13. The Court explained that its research indicated that the clear and convincing burden applied primarily to oral contracts involving real estate transfers and settlement agreements. *Id.* The Court referenced *J-Way Leasing, Ltd. v. American Bridge Co.*, 500 F. App'x 365 (6th Cir. 2012) in support of its decision.

It is true that many cases applying the clear and convincing burden to oral contracts involved settlement agreements and land conveyances. *See*, *e.g.*, *Kessler v. Kessler*, No. 26239, 2015 WL 1966052, at *6 (Ohio Ct. App. 2d Dist. May 1, 2015) (settlement agreement); *Pawlowski*

19

*v. Pawlowski*, 83 Ohio App. 3d 794, 615 N.E.2d 1071 (Ohio Ct. App. 10th Dist. 1992) (settlement agreement); *Anschutz v. Radiology Assocs. of Mansfeld, Inc*., 827 F. Supp. 1338, 1344 (N.D. Ohio 1993) (settlement agreement); *Inhalation Plastics, Inc. v. Medex-Cardio-Pulmonary, Inc*., No. 2:07-cv-116, 2007 WL 4270621, at \*4 (S.D. Ohio Dec. 3, 2007) (settlement agreement); *In re Rhoads*, 162 B.R. 485, 490 (Bankr. N.D. Ohio 1993) (settlement agreement); *Widok v. Estate of Mary Wolf*, No. 108717, 2020 WL 6504277, at \*10 (Ohio Ct. App. 8th Dist. Nov. 5, 2020) (agreement involving the sale of real property).

But many cases, including several ***recent*** cases, have applied the clear and convincing burden to oral contracts in contexts other than settlement agreements and land conveyances. *See*, *e.g*., *DC Welch Trucking LLC v. Lagowski*, No. 21 BE 0006, 2021 WL 6110250, at \*4 (Ohio Ct. App. 7th Dist. Dec. 31, 2021) (court applied clear and convincing standard to oral contract for appellee to deliver stone to appellant valued at over $27,000); *JK Prods. & Svcs., Inc. v. JLW-TW Corp*., No. 1:19CV1908, 2021 WL 4481348, at \*5, n.8 (N.D. Ohio Mar. 10, 2021) (applying clear and convincing standard to oral contract for the sale of goods and noting that the higher burden applies because "oral contracts are disfavored."); *Cooper v. City of West Carrollton*, 112 N.E.3d 477, 483-84 (Ohio Ct. App. 2d 2018) (former employee brough breach of oral contract claim against former employer related to employer's alleged promise of a promotion; court applied clear and convincing standard); *Adams v. Karl*, No. 2:13-cv-894, 2016 WL 7210920, at \*4 (S.D. Ohio Dec. 13, 2016) (oral agreement for defendant to pay plaintiff $10,000 per month); *Kodu v. Medarametla*, No. C-160319, 2016 WL 7131035, at \*3 (Ohio Ct. App. 1st Dist. Dec. 7, 2016) (oral agreement to loan money); *Ramum v. Ramum*, No. 12 MA 61, 2014 WL 4977495, at \*7 (Ohio Ct. App. 7th Dist. Sept. 29, 2014) (oral agreement to provide bonus to shareholder).

Furthermore, the Defendants respectfully submit that the *J-Way* decision does not support

20

application of the preponderance burden.  In *J-Way*, the parties did not dispute the burden in the lower court, *see J-Way Leasing, Ltd. v. American Bridge Co.*, 1:07-cv-03031, ECF Nos. 100, 103, 151, 154 (N.D. Ohio 2009), nor did they do so on appeal.  *See generally J-Way Leasing, Ltd. v. American Bridge Co.*, 500 F. App'x 365 (6th Cir. 2012).

In short, the overwhelming majority of caselaw in Ohio—including the recent caselaw cited above—supports applying the clear and convincing burden for oral contracts in Ohio, even if the alleged oral agreement involves a contract other than a settlement agreement or land conveyance.  For these reasons, Defendants ask the Court to apply the clear and convincing burden to this claim.

### Plaintiffs' Promissory Estoppel Claim

Plaintiffs may assert that their claim for promissory estoppel is subject to a preponderance of the evidence standard.  Defendants, however, assert that such claim is also subject to the clear and convincing standard.

At the previous trial, the Court applied the clear and convincing standard to this claim. Sealed Trial Tr. v.4, Doc. #69 at 785:14-25, 786:1-25 & 787:1-11.  That order is the law of the case and should continue to govern in the subsequent trial.  Plaintiffs may cite to the Sixth Circuit's remand opinion and argue that this Court should apply the preponderance burden.  *See Grassi v. Grassi*, No. 20-3358, 2021 WL 3355475, at *9 (6th Cir. Aug. 3, 2021) (stating that the Plaintiffs argued "persuasively" the issue of whether the Court should have applied the clear and convincing burden to the promissory estoppel claim but not reaching the merits of the issue).  But the Sixth Circuit explicitly did not resolve the issue of whether the preponderance or clear and convincing burden applies to promissory estoppel claims, and therefore the statement from the Sixth Circuit is *dicta* with respect to the issue.

Moreover, this Court got it right the first time.  Most of Ohio's appellate courts have indicated that the clear and convincing burden applies to promissory estoppel claims.  *See Hayes v. Brown*, No. 7-89-9, 1990 WL 188257, at *5 (Ohio Ct. App. 3d Dist. Dec. 3, 1990); *Dailey v. Craigmyle & Son Farms, LLC*, 894 N.E.2d 1301, 1307 (Ohio Ct. App. 4th Dist. 2008); *Swank v. Swank*, 2011-Ohio-6920, ¶ 109 (Ohio Ct. App. 5th Dist. 2011); *El-Tatawy v. Leader Nat. Ins. Co*., No. L-96-281, 1997 WL 543058, at *3 (Ohio Ct. App. 6th Dist. Aug. 29, 1997); *Circuit Sols., Inc. v. Mueller Elec. Co*., 2006-Ohio-4321, ¶ 5 (Ohio Ct. App. 9th Dist. 2006); *Takacs v. Morgan*, No. 93-G-1760, 1993 WL 408181, at *4 (Ohio Ct. App. 11th Dist. Sept. 30, 1993); *A N Bros. Corp. v. Total Quality Logistics, LLC*, 59 N.E.3d 758, 774 (Ohio Ct. App. 12th Dist. 2016).  The Northern and Southern federal district courts have also applied the clear and convincing standard.  *See Bolson Materials Int'l, Inc. v. 3d Sys. Corp*., No. 5:14CV01441, 2016WL 5661613, at *6 (N.D. Ohio Sept. 30, 2016); *B & S Transp., Inc. v. Bridgestone Ams. Tire Operations, LLC*, No. 5:13-CV-2793, 2014 WL 804771, at *7 (N.D. Ohio Feb. 27, 2014); *Book Dog Books, LLC v. Cengage Learning, Inc*., No. 2:12-cv-1165, 2013 WL 65465, at *3 (S.D. Ohio Jan. 4, 2013).

Plaintiffs may argue that (i) these decisions are unsound because they rely on the misapplication of *Kroll v. Close*, 92 N.E. 29 (Ohio 1910), and (ii) the Ohio Judicial Conference's *Ohio Jury Instructions* suggest the preponderance standard.  But this Court should rely on the case law embodied in Ohio's appellate court and federal district court decisions "even if the Court believes that the rule is 'unsound.'" *Kurczi v. Eli Lilly & Co*., 113 F.3d 1426, 1429 (6th Cir. 1997) (brackets and citation omitted).  "[W]here a state appellate court has resolved an issue to which the high court has not spoken, this Court will normally treat those decisions as authoritative absent a strong showing that the state's highest court would decide the issue differently." *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 707 (6th Cir. 1994) (cleaned up).  And to the extent the Plaintiffs rely

on the *Ohio Jury Instructions*, the Twelfth District correctly noted in *A N Bros. Corp.* that the instruction with respect to the burden for promissory estoppel claims is outdated.  59 N.E.3d at 774, n.2.

## G.  ESTIMATED LENGTH OF TRIAL

Defendants estimate that the trial of this matter will take no longer than 8 days, between May 31-June 3 and June 7-10, and concluding by June 10, 2022.

## H.  DEPOSITIONS AT TRIAL

Defendants do not expect to use any depositions at trial other than as necessary for impeachment of witnesses.  All of Defendants' witnesses are expected to appear and testify in court.

Respectfully submitted, this 19th day of May, 2022.

*/s/ Suzanne Bretz Blum*
Suzanne Bretz Blum (0047231)
Brouse McDowell
600 Superior Avenue East, Suite 1600
Cleveland, Ohio 44114
P: (216) 830-6830 / F: (216) 830-6807
sblum@brouse.com

*/s/ John M. Moye*
John M. Moye (GA Bar 685211)*
Barnes & Thornburg LLP
3475 Piedmont Road, Suite 1700
Atlanta, Georgia 30305
P: (404) 264-4006 / F: (404) 264-4003
jmoye@btlaw.com

*/s/  Cole Ramey*
Cole Ramey (TX Bar No. 16494980)*
Kilpatrick Townsend & Stockton, LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
P: (214) 922-7100 / F: (214) 922-7101
cramey@kilpatricktownsend.com

23

*/s/ Steven Moore*
Steven Moore (CA Bar No. 290875)*
Kilpatrick Townsend & Stockton, LLP
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111
P: (415) 273-4741 / F: (415) 651-8510
smoore@kilpatricktownsend.com

* Admitted *Pro Hac Vice*
*Counsel for Defendants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this date, I electronically filed a redacted copy of the foregoing **DEFENDANTS- COUNTERCLAIMANTS' TRIAL BRIEF** via the Court's ECF system. I further certify that counsel of record for Plaintiffs is a registered ECF user and that service will be accomplished by the ECF system.  I further certify that a sealed copy of **DEFENDANTS-COUNTERCLAIMANTS' TRIAL BRIEF** was served by email today to counsel of record for Plaintiffs.

*/s/ Suzanne Bretz Blum*
Suzanne Bretz Blum (0047231)
*Counsel for Defendants*

1471387.v2

24